UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NANCY HART,

         Plaintiff,

    v.

UNUM LIFE INSURANCE COMPANY
OF AMERICA,

         Defendant.

Case No. 15-cv-05392-TEH

**ORDER GRANTING PLAINTIFF'S
MOTION FOR JUDGMENT AND
DENYING DEFENDANT'S MOTION
FOR JUDGMENT**

Presently before the Court is Plaintiff Nancy Hart's ("Hart") Employment Retirement Income Security Act ("ERISA") action concerning the termination of her long term disability ("LTD") benefits, pursuant to 29 U.S.C. § 1132(a)(1)(B). *See* ECF No. 1 ("Compl."). Hart seeks to recover disability benefits allegedly owed to her under the terms of her disability plan from June 14, 2012 through the present date, together with pre-judgment interest on each payment. Compl. ¶ 26. Hart has filed a motion for judgment, ECF No. 57 ("Hart Mot."), and Unum has filed a cross motion for judgment ("Unum Mot."). Both Parties timely opposed the other's motion. ECF Nos. 59 ("Unum Opp'n."), 60 ("Hart Opp'n."). The Court heard oral arguments on the Parties' motions for judgment on May 8, 2017. After carefully considering the administrative record ("AR"), *see* ECF No. 56, the Parties' written and oral arguments, and the relevant case law, the Court GRANTS Hart's motion for judgment and DENIES Defendant's cross motion for judgment.

I. **FINDINGS OF FACT**

    a. **Hart's Employment and Educational Background**

Hart attended Cal State Sacramento and received a BS in Nursing in 1989 and an MS in Nursing in 1990. AR 368, 4043. She has approximately twenty-five years' experience working as a licensed registered nurse in California. AR 4043. Hart worked as a Registered Nurse from 1980 to 1989. AR 2464. Starting some time in 1990, Hart began

working full-time as a nurse supervisor/manager. *Id.* In 1998, Hart was employed by Catholic Healthcare West as a Regional Manager, Case Management. AR 60, 2462. Hart reported that she managed the Hospitalist Program, directed and supervised over twenty-five employees, determined the length of stays for a 265-bed hospital and controlled budgets and finances, which included planning and forecasting. AR 45, 95. Hart remained in this position until the time she discontinued full-time work on June 30, 2004, before applying for LTD benefits. AR 45–47.

### b. Hart's Accident and Initial Medical Treatment

Hart's back problems began on April 7, 1985. AR 4043. While flying back from a vacation, Hart volunteered to administer Cardiopulmonary Resuscitation ("CPR") on a fellow passenger who was experiencing a life-threatening emergency. AR 1586, 4043. In lifting the male passenger from his airplane seat to lay him down to perform CPR, Hart injured her back. AR 4044. As a result of the injury, Hart was off work for three weeks; her back pain gradually increased over time and never went away. AR 1586, 4044. Despite her injury, however, Hart was able to continue working as a nurse by managing her back pain symptoms with physical therapy, epidural steroid injections ("ESI") and pain medications. AR 4044. Around the time Hart transitioned to an administrative role in 1990, Hart began relying on Dr. Denyse Nishio, M.D., a Board Certified Internist, to help manage her symptoms. AR 4044, 4291. From 1990 to September 2001, Hart continued to manage her back pain through a regimen that included visits to a chiropractor, massage therapist, and prescription analgesics for severe pain flare ups. AR 4044.

In September 2001, Hart lost her balance doing home chores and hyperextended her back. AR 4045. Dr. Nishio sent Hart to obtain Magnetic Resonance Imaging ("MRI") on her back. AR 1581, 4045. Hart obtained the MRI on her back on October 14, 2001. AR 142. Upon reviewing Hart's MRI images, Dr. Arthur Dublin, M.D., reported the following impressions:

> 1. Mild broad-based disc bulges with left parasagittal component at L4-L5 and L5-S1 with tear of the annulus fibrosus at L4-L5. No significant neural foraminal or spinal

2

canal narrowing.
2. Vertebral body hemangiomas at L1 and L2.

AR 142–43.  By November 2001, Hart's symptoms became so severe she could not tolerate sitting for more than twenty-five minutes, and standing for more than a few minutes caused her "excruciating" pain.  AR 4045.  In light of these restrictions, Hart took medical leave from work, and Dr. Nishio referred Hart to Dr. Gagan Mahajan, M.D., a Pain Medicine and Rehabilitation Doctor.  AR 4045.  In early 2002, Dr. Mahajan's pain clinic administered three ESI's on Hart's back: one in January, one in February, and one in April.  AR 295.  On June 5, 2002, Dr. Mahajan conducted a follow-up evaluation of Hart.  AR 294.  Hart reported intermittent (50% of the time) pain described as "sharp, dull aching, and throbbing."  She also reported to Dr. Mahajan that she had received excellent benefits from this series of ESIs, AR 296, 4045; and that her range of motion had improved, AR 4045.  Dr. Mahajan recommended Hart undergo further ESIs on her back while increasing the intervals between the injections.  AR 296.  At the same time, he reminded Hart that ESIs were not meant to be lifelong treatments and would not change the anatomy of her back.  AR 296.  Also, during this visit, Dr. Mahajan reviewed the MRI images and concluded Hart had lumbar disk degenerative disk disease with an annular tear at L4-5 and Spina Bifida Occulta at S1.  AR 296.

In 2002, Hart returned to work full time as a Regional Manager for Catholic Healthcare West.  AR 4045.  But her pain hindered her from dealing with the demands of her job.  For the next two years Hart would use pain medications, wear a back brace, sit in a "zero-gravity" chair that would relieve pressure from her spine and pelvis, use a transcutaneous electrical nerve stimulation ("TENS") unit, and sleep on a special mattress to manage her pain.  AR 4045–46.  By June 2004, Hart decided her pain was too much and completely stopped working.  AR 4046.

On September 17, 2004, Hart underwent a second MRI study on her back.  AR 144.  Dr. James Brunberg, M.D., reported the following "impressions" from Hart's MRI:

1. At the L4-5 disk space levels there are small midline annular tears as further described above.  There is not significant

distortion of the thecal sac or of originating root sleeves.

2. At the L5-S1 level, there is degenerative disk alteration with decreased disk space height and decreased disk T2 signal intensity. There is no disk herniation.

3. There is mild facet degenerative alteration at mid and lower lumbar levels.

AR 144-45. On November 11, 2004, Hart was evaluated by Dr. James Zucherman, M.D.

AR 481–83. Upon physically examining Hart and comparing her 2001 and 2004 MRIs,

Dr. Zucherman concluded:

> Ms. Hart has multilevel degenerated discs. Most of the pain, by vibration, seems to be around the L4-5 level, or L5-S1. Since there are small abnormalities at all the lumbar discs, we would have to localize and isolate the pain generator to consider her a reasonable surgical candidate. This will require discography, which is appropriate in light of her level of misery. The patient will contact us when she wishes us to set up the discogram.

AR 481. Dr. Zucherman also noted Hart rated her pain at "7 most of the time" on a 10-

point scale. AR 482. Hart never pursued or obtained a discogram. On October 28, 2004,

Ms. Hart filed a claim to Unum seeking disability benefits for a June 30, 2004 date of

disability. AR 45.

### c. Hart's Policy Terms and Disability Claim

On January 1, 2002, Hart's Long Term Disability ("LTD") policy with Unum

became effective. AR 2. To be eligible for benefits under Hart's policy, a person must be

"disabled" which is defined in the policy as follows:

> You are disabled when UNUM determines that:
>
> > -You are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and
> > -you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.
>
> After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

AR 1311. "Gainful occupation" is defined in Hart's policy as "an occupation that is or can

be expected to provide [her] with an income at least equal to 60% of [her] indexed monthly

earnings within 12 months of your return to work." AR 3432. At the time Hart's benefits

were terminated, the policy definition for the latter "any occupation" provision changed to the following:

> You will be determined to be disabled from another occupation when you are rendered unable to engage with reasonable continuity in another occupation in which you could reasonably be expected to perform satisfactorily in light of your age, education, training, experience, station in life, physical and mental capacity.

AR 2000. In order to be eligible for LTD benefits, a covered person must be disabled for an "elimination period" of 180 days. AR 3410. Hart satisfied the elimination period on December 27, 2004, AR 2355, and on December 27, 2006, the definition of disability changed from "regular occupation" definition to the "any occupation" definition. AR 3373. Under Hart's policy, persons who become disabled younger than age sixty may collect benefits up until age sixty-five.[1]

### d. UNUM's Initial Approval of Long Term Disability Benefits

In Hart's initial LTD claim submitted to Unum on October 28, 2004, she stated she suffered from a "[l]ong progressive history of chronic back pain due to bulging disc at L4-L5, L5-S1 and disc degenerative disease." AR 45. Hart also claimed she "collapsed in unrelieved, unrelenting back pain after work day of 6/29/04. Unable to get out of bed next day." AR 45. Dr. Nishio, completed an Attending Physician's Statement ("APS") in which she claimed Hart had the following restrictions: "Must lie down, traction x 30 [illegible], no bend, stoop, twist, lift >10 [pounds]". AR 50. Dr. Nishio also stated the following limitations: "unable to perform simple household chores[,] difficulty & ADLs[,] cannot sit stand >30[,] cannot reach, twist [,] any sustained activity exac[erbates] pain." AR 50.

On March 8, 2005, Ms. Tina Sheek, a registered nurse of Unum, performed a medical review and opined that the restrictions and limitations provided by Dr. Nishio "are supported from [the date of disability] through 02/05 to stabilize her exacerbated symptoms." AR 242–43. Unum approved Hart's LTD claim on March 10, 2005, and

---

[1] Hart turned sixty-five on January 15, 2016. ECF No. 57 at 4:12–13.

provided backdated payments through December 27, 2004. AR 257.

**e. Hart's Continuing Medical Treatment and Unum's Ongoing Verifications of Disability**

From 2004–2011, UNUM paid Hart LTD benefits while relying on supporting documents from Hart's doctors.

On March 10, 2005, Unum sought continuing verification of Hart's disability. Dr. Nishio reported Hart had back pain and was not able to twist/bend/lift. AR 320. Nishio also reported that Hart was using analgesics, a corset, and physical therapy for treatment; AR 320, and opined that Hart's ability to return to gainful employment on a part-time or full-time basis was "unlikely." AR 321.

On April 22, 2005, Unum received an estimated functional abilities form, in which Dr. Nishio indicated that, based on her clinical experience and Hart's reporting, Hart could do the following on an occasional basis: lift up to ten pounds, bend, climb stairs, reach above shoulder, and push or pull fifteen pounds. AR 323. Dr. Nishio also indicated that in an eight-hour workday, Hart could only perform two hours of sedentary activity.[2] AR 324.

On December 7, 2005, Hart began seeing Dr. Christina Lasich, a Physical Medicine and Rehabilitation specialist.[3] AR 511. On June 30, 2006, Dr. Nishio provided an APS stating that Hart could only sit up to one hour but that she could not walk or stand in an eight-hour work day. AR 472. Dr. Nishio also reported that Hart's "severe" back pain was being treated with analgesics, anti-inflammatories, and muscle relaxers. AR 471.

On December 5, 2006, Virginia Reynolds, a registered nurse of Unum contacted Dr. Lasich to determine whether Hart was capable of returning to any "gainful occupation."

---

[2] The form defined "Sedentary Activity" as "10 lbs. maximum lifting or carrying articles. Walking/standing on occasion. Sitting 6/8 hours." AR 324.
[3] Dr. Lasich was Ms. Hart's daughter. Two physicians noted in the administrative record that this created a conflict of interest. AR 4003, 4440. Ms. Hart's LTD Plan provides that a physician who is a relative is not a recognized physician under the Plan. AR 35. Yet, Unum requested additional information from Dr. Lasich at least eight times: September 19, 2006 (AR 2601); December 5, 2006 (AR 610); September 17, 2007 (AR 2850); November 5, 2007 (AR 2911); June 12, 2008 (AR 2982); February 2, 2009 (AR 3126); May 20, 2009 (AR 3234); and May 13, 2011 (AR 3517).

United States District Court
Northern District of California

1    Dr. Lasich stated Hart could not tolerate prolonged sitting activity as she would need an

2    hourly change in position.  AR 610–11.  Dr. Lasich further opined that Hart would be

3    "unable to sustain repetitive days in a row of working," but that she could sustain part-time

4    work if she had days in between for recovery and for frequent changes in position every

5    hour.[4]  AR 611.  After the call, Ms. Reynolds concluded Hart "would not have sustainable

6    function due to ongoing pain," AR 611, and Unum approved Hart's continued benefits

7    claim that same day.  AR 617.  That same day, a representative of Unum called Hart to

8    inform her that her continuing benefits had been approved and that Unum was sending her

9    a letter in the mail.  AR 620.  During this call, Hart mentioned she was considering part-

10   time work as a school nurse.  Hart explained she could not work very long without a break,

11   so she might have to alternate days working.  Hart also explained she thought she would

12   only make "about 20-30% of what she was making before she got hurt."  The Unum

13   representative told her "as long as her earnings are < 60% of indexed BME (after 24

14   months), then she would still be eligible for a benefit."  AR 620.

15       As mentioned above, Unum agrees the definition of Hart's disability changed from

16   the "regular occupation" definition to the "any gainful occupation" definition on December

17   27, 2006 (after 24 months of disability payments) according to Hart's policy.  Unum Mot.

18   at 7:2–3.

19       On January 9, 2007, Hart called Unum to report that she had started part time

20   employment as a school nurse for Nevada Joint Union High School District on December

21   14, 2006.  Hart reported she worked three-fifths of a full-time position in terms of hours,

22   and that she worked Monday, Wednesday, and Thursday.  AR 632.  On February 9, 2007,

23   Dr. Lasich noted that Hart's part-time work was "going well," that Hart was tolerating

24   additional activities like painting & light yard work; Dr. Lasich prescribed Hart 30 mg of

25   MS Contin four times per day.  AR 805.  On April 11, 2007, Dr. Lasich noted Hart had had

26

27   _____
     [4] During this call, Dr. Lasich also mentioned that Hart had been approved for surgery but
28   that Hart had not agreed to it yet.  AR 611.  Unum contests whether this fact was true.
     Unum Mot. at 7:12–14.

1   no major flare-ups; Hart's part-time job was "working out well"; and Hart was able to

2   work in her yard and do light gardening. Hart was again prescribed to 30 mg of MS

3   Contin four times per day. AR 803

4       On November 13, 2007, Dr. Lasich reported Hart was still suffering from

5   recurrent/chronic back pain, but was working part time at 30 hours per week and that Hart

6   was limited to semi-sedentary work. AR 822–23. Dr. Lasich also reported she "never"

7   expected improvement in Hart's capabilities. AR 822. On November 19, 2007, Hart's file

8   was reviewed by Pamela Thurston, a registered nurse of Unum. Ms. Thurston opined that

9   Hart's part-time status remained reasonable and Hart's level of activity did not exceed the

10  restrictions and limitations set by Hart's attending physician. AR 829. Ms. Thurston also

11  noted that it was "unlikely" that Hart's functional capability would improve without

12  surgery.[5] AR 830.

13      On March 26, 2008, Hart contacted Unum by phone to inform it she had received

14  notice that her employment as a school nurse was ending July 1, 2008. Hart mentioned

15  that nine other people had been released as well.[6] AR 861. During this call, Hart expressed

16  an interest in seeking other employment; in fact, she mentioned she had applied for a

17  public health job and had received no response, and that she had considered Unum as a

18  potential employer. AR 861. At the same time, Hart stated it had been a "rough

19  semester," that she had to increase her pain meds, that "sheer willpower" had kept her

20  working, and that she did not think "there would be any employers out there that would be

21  willing to hire her with her disability." AR 861.

22      On April 2, 2008, Dr. Lasich noted Hart was experiencing more frequent back pain

23  and that working three days in a row was adding to Hart's increased pain. AR 891. On

24

25  [5] Again, Unum contends Hart was never a candidate for surgery. Unum Mot. 8 at 23–25;
    *see supra* note 4.

26  [6] It is unclear from the administrative record why Hart's position ended. Unum claims her

27  position was merely eliminated, Unum Mot. at 8:28–9:1 (citing AR 861). Hart claims her
    employment contract was not renewed because the school district could not accommodate
    her restrictions, Hart Mot. at 8:19–21 (citing AR 4142). In any event, the Court's decision

28  is not affected by the outcome of this dispute.

April 21, 2008, Dr. Lasich wrote a letter for Hart explaining that Hart should be permanently excused from jury duty because she was "unable to sit or stand for prolonged periods of time due to chronic pain." AR 890.

On May 30, 2008, Hart faxed Unum a letter from Dr. Nishio stating: "Ms. Hart will need to remain off work because of ongoing back pain effective June 6, 2008. I see this disability as permanent and stationary." AR 871. On May 31, 2008, Dr. Nishio examined Hart and stated her back had been recently aggravated by a cough but was "generally [] well-managed on her meds." AR 933. Dr. Nishio also noted Hart had to increase the use of Vicodin due to the stress of work, that Hart did not show motor or sensory deficits, and that she was no longer wearing a corset. AR 933. On June 2, 2008, Dr. Lasich noted Hart was using Vicodin and MS Contin daily, that she was unable to tolerate full-time employment, and that she needed to work less than twenty hours per work week for "adequate recovery from lumbar pain." AR 887.

Starting sometime around June 2008, Hart began experiencing pain in her right foot. AR 4084. But Hart did not seek medical treatment for her foot at this time. From June 2008 until September 2008, Dr. Lasich continued to prescribe Hart 30 mg of MS Contin four times per day. AR 1037. On September 22, 2008, Dr. Lasich reported Hart was working in her yard daily as long as she sat down frequently and that Hart felt better from eating better. AR 1037. Sometime around December 2008, Hart began seeing Dr. Gina Lokna, M.D., a Sports Medicine Specialist, to address her right foot pain.[7] AR 1015. On December 9, 2008, Hart obtained x-rays of her right foot, which showed no evidence of a fracture or dislocation. AR 4084. On January 13, 2009, Hart had an MRI done on her right foot. The images showed she had "enhancing palpable plantar nodules consistent with Plantar Fibromatosis." AR 3137. However, Hart reported in February 2012 that she

---

[7] Mr. Feng's field visit report notes that Hart's last visit with Dr. Lokna was in December 2009, but this would be impossible as Mr. Feng visited Hart on January 26, 2009. *See infra.* Thus, the correct date is more likely to have been December 2008. This is confirmed from Dr. Lokna's records, which indicate a visit from Hart on December 9, 2008. *See* AR 4084.

treated her nodule with a crème that caused the nodule to recede.[8]  AR 1881.

On January 26, 2009, Unum conducted a field visit through Daniel Feng.  AR 1013.
Mr. Feng made some physical observations during his visit to Hart's home.  He reported "a
subtle but distinct right side limp as she walked," that ten minutes into the interview Hart
"began repeatedly moving and shifting her body position back and forth in her chair", and
that after fifteen minutes, due to the pain from sitting, Hart had to physically stand up and
retreat to her recliner in her living room.  AR 1014.  At one time during the visit, Mr. Feng
observed Hart lift and remove her eleven-pound cat that had jumped onto the dining room
table.  When Mr. Feng asked if such action caused her back pain, she stated it did not
because her cat was lifted from an elevated position.  AR 1016.  During the interview, Hart
reported chronic lower back pain, chronic arthritic pain in her hands, wrists and thumbs,
and foot pain from a quarter-size cyst on the bottom of her right arch.  AR 1014.  When
asked about her restrictions and limitations, Hart reported that aside from being in pain all
the time, the following caused severe pain in her lower back: (1) standing upright for more
than five minutes at a time; (2) sitting upright in an "office-type" setting for more than
fifteen minutes at a time; (3) lifting more than ten pounds; and (4) walking more than two
or three standard city blocks.  AR 1016.  When asked about her daily activities, Hart
reported she lived by herself and that so long as she was medicated she could handle all
her household chores, including cooking, cleaning, grocery shopping, and laundry.  AR
1017.  She also mentioned she could care for herself and had "no difficulty in driving short
distances; however, she generally avoid[ed] any distance over fifteen-minutes in duration."
AR 1017.  Hart also reported spending about one hour per week working on her home's
computer to manage her e-mail and to do medical research.  AR 1017.

On February 4, 2009, Unum received an APS from Dr. Lasich which noted that
Hart had recurring lower back pain for years, and that Hart's treatment included a home
exercise program and opiate pain management.  AR 1032.  In this APS, Dr. Lasich opined

---

[8] The administrative record does not reflect when exactly the nodule was treated.

United States District Court
Northern District of California

that in an eight-hour work day Hart could sit intermittently for up to five hours; could stand intermittently for one to two hours; and could walk intermittently for one to two hours. AR 1033. As a result, Dr. Lasich stated Hart was "unable to tolerate gainful employment; unable [sic] prolonged sit, stand, walking & lifting." Dr. Lasich's notes from the same visit state Hart's lower back pain was "fairly well controlled with just MS Contin." AR 1034.

On March 12, 2009, Dr. Nishio submitted an APS to Unum claiming that Hart was still experiencing severe back pain, and that in an eight-hour day, Hart could sit, stand, or walk intermittently for up to one hour at a time. AR 1077. Dr. Nishio also reported Hart had become "increasingly anxious and despondent since her back pain has progressed and limited her professional development and performance." AR 1077. In October 2010, Unum contacted Hart to obtain an update of her status. Hart stated, "everything is pretty much the same" and that if she exercises too much, her sciatica has issues. Hart also reported she was still using her Tempur-Pedic bed and zero-gravity chair. AR 1351. On October 10, 2010, Dr. Nishio examined Hart. Dr. Nishio reported:

> Back is status quo. Back goes in cycles from stabbing, tender, throbbing [sic]. Zero gravity chair helps relieve the pain. Doing some exercises. The gym ball helps with core strengthening. Doesn't always use the back brace. Still on vicodin for breakthrough and MS contin 30mg four times a day which she gets from her physiatrist [sic]. No new motor or sensory defecits [sic]. Occasionally will wear the back brace, not as often as before.
>      . . .
> Uses the voltaren gel on her foot. Does help with pain there.

AR 1455. On November 8, 2010, Dr. Nishio submitted another APS in which she reported Hart was continuing to experience back pain, fatigue, and spasms. Dr. Nishio opined that in an eight-hour workday Hart could never sit, and that Hart could stand and walk occasionally. AR 1369–70.

### f. Hart's Applications for Social Security Benefits

Sometime in 2007, Hart applied for Social Security Disability Income Benefits. Hart informed Unum on December 5, 2006 that her claim had been denied. AR 620. Hart

11

then pursued an appeal.  *See* AR 620.  However, on April 24, 2007, after accepting a part-time position as a school nurse, Hart withdrew her request for Social Security benefits.  AR 716.  On June 21, 2007, Hart received a letter stating that her appeal had been denied.  AR 710.[9]  The letter explained that Hart's records showed she had degenerative changes in her spine and problems with disks in her lower back.  The letter also recognized that although she experienced "some back movement limitations," her muscle strength and sensory capacities were intact.  AR 710.  Therefore, while Hart was found unable to return to any of her past relevant work, she had skills that could be transferred to a less strenuous job.  AR 711.

### g.  Settlement Offer and Rejection

On March 7, 2011, Unum mailed Hart a one-time, lump-sum settlement offer of $159,740.00 to buy out her policy.[10]  AR 1386–87.  The letter explained there "was no obligation at all for [Hart] to accept" the offer and that if Hart declined the offer, Unum would "continue to pay [her] benefits each month as long as [she] continue[d] to be eligible for benefits under [her] policy."  AR 1389.  On April 7, 2011, Hart called Unum to decline the settlement offer.  AR 3506.

### h.  Post-Settlement-Rejection Medical Treatment and Verification of Disability

On May 13, 2011, Unum contacted Hart via phone for a status update.  Hart reported her pain was well managed with taking Morphine daily and that she was also stretching regularly and using her zero-gravity chair. AR 1424.  Hart stated she needed to be very careful about how she moved to avoid extreme pain.  When asked about other

---

[9]  Although the administrative record contains a letter from Hart to Ms. Manasero dated April 24, 2007 requesting a withdrawal of her request for social security benefits, AR 716, it is unclear why she received a decision from the social security administration on her appeal.

[10]  Unum explained this amount was 70.52% of the present value of her claim at the time the settlement offer was made ($226,529.64).  Unum provided that the partial reduction was due to "general uncertainties of the future," such as "interest rate fluctuations, unforeseen accidents, morbidity and mortality risks, and the possibility of medical advancements."  AR 1390.

conditions that may prevent her from working, Hart reported balance problems because of her back and progressing arthritis in her wrists which prevented her from using a computer or phone for longer periods of time. AR 1424–25. Sometime around July 2011, Hart stopped seeing Dr. Lasich. AR 1438. On July 29, 2011, Dr. Nishio examined Hart again. AR 1460. Dr. Nishio reported Hart was "overall doing somewhat better off work and on current meds." AR 1460. Dr. Nishio also reported:

> [Hart] has to continue to monitor her activies [sic] but does well in a controlled environment. No motor or sensory defects [sic]. Trying to wean off the meds. Not wearing the corset. Still has all the limitations of the [Degenerative Disc Disease]. Overall feels less foggy on these meds. Still lower back tenderness especially late in the afternoon.
> . . .
> R foot bump (plantar nodule) is not bothersome. Occasionally will use her voltraren topically.

AR 1460. Dr. Nishio submitted another APS reporting persistent pain, spasms, overall fatigue, and limited range of motion of back. AR 3534.

### i. Unum's Roundtable and Subsequent Actions by Unum

On August 24, 2011, Unum held a "roundtable review" on Hart's policy.[11] Unum determined Hart's "Gainful is very high and [Hart] appears to have less than sedentary. May not be any gainful occupations at sedentary any way due to high gainful amount – will have to take a closer look to confirm if she ends up having work capacity."[12] Unum then decided to review Hart's medical records to confirm if her restrictions and limitations were supported. AR 3548. On October 27, 2011, Unum held another meeting. AR 1466. Unum decided to conduct a pre-vocational analysis to determine if Hart would have gainful occupation if she was found to be capable of full-time sedentary work. AR 1466.

---

[11] During oral arguments, Defendant's counsel clarified that this review was prompted by an inquiry as to whether Hart's file should have been transferred to the Special Benefits unit, where minimal claim information is requested because the clients are likely to remain on claim through age 65. Unum Mot. at 12:3–7.

[12] Hart's Plan established that a gainful occupation "is an occupation that is or can be expected to provide the [insured] with an income that is at least 60% of the [insured's] current indexed pre-disability earnings within 12 months of the [insured's] return to work. According to a gainful calculation that was performed on August 22, 2011, Plaintiff must be able to make $5,516.00 per month, which equated to an hourly wage of $31.83. AR 1444–45.

13

On November 7, 2011, Michael Stevens, a Vocational Rehabilitation Consultant for Unum performed a vocational review of Hart's prior work history and education and identified the alternate occupation of Medical Service Manager. AR 1472. The median monthly wage for this position was $6,179 with a sedentary exertion level. AR 1473.

On December 6, 2011, Unum held another roundtable in which, Dr. Todd Lyon, M.D., a Medical Consultant for Unum, reviewed Hart's medical file. AR 1499, 1526. Dr. Lyon concluded the following:

> Review of recent PCP notes document the obersvation [sic] of no acute distress and no back tenderness to palpitation in 2008 and in 7/2011 documentation of mild paralumbar tenderness and again no acute distress. Insured is on chronic narcotics. No imaging studies to review since 2004; lumbar MRI from 2004 reveals small annular tears at L1-2, L4-5 and more significant [Degenerative Disc Disease] at L5-S1 and mild facet disease at lower lumbar levels. Providers confirm no radicular symptoms or focal neurologic deficits. OSP feels that recent documentation does not necessarily preclude sustained full time seated work with high cognition requirements . . . and will inquire further with PCP via AP contact.

AR 1499–1500.

### j. Alleged Phone Call Between Dr. Lyon and Dr. Nishio

On December 16, 2011, Dr. Lyon supposedly contacted Dr. Nishio by phone to discuss her opinion on Hart's condition.[13] On December 19, 2011, Dr. Lyon sent a confirmation letter to Dr. Nishio summarizing their conversation. Dr. Lyon's letter stated the following:

> You and I discussed Ms. Hart's medical history by phone on 12/16/11. You verified that she complains of chronic [lower back pain] and poor sitting tolerance. She has small annular tears at L1-2 and L2-3 with degenerative disc disease at L5-S1 and mild lumbar facet disease. She has not had a lumbar MRI since 2004. She also has plantar fasciitis that limits her weight bearing capacity. You indicated that during brief office visits, Ms. Hart appears comfortable. You reported that she had a failed attempt to return to part time work in the past. When I asked you if you felt Ms. Hart was medically precluded from engaging in full time primarily seated work activities with no lifting > 10 pounds occasionally, only occasional and brief

---

[13] The parties heavily contest whether this call ever happened and, if it did, what the content of the conversation entailed. *See* Hart Opp'n. at 6; Unum Opp'n. at 7.

> periods of standing and walking, and with the freedom to reposition/stretch periodically throughout the day for comfort, you indicated that you did not know and had no opinion. You indicated that a PMR IME should be done and that without this, you had no opinion on Ms. Hart's functional capacity.
>
> If you agree with the summary of our discussion as set forth above, there is no need to respond to this letter. However, if you would like to add or correct any of the above statements, please write your comments directly on this letter or send a response under separate cover.

AR 1525–26. While Unum reports it never received a response to Dr. Lyon's letter, Hart contends Dr. Nishio never received the letter. Hart Mot. at 9:26–10:6; Hart Opp'n at 7:3–10. The record reflects Unum never verbally confirmed whether the fax was received and that the physical letter was mailed to a completely separate facility about two miles away from Dr. Nishio's office. AR 1525, 1528.

### k. Dr. Bermudez's Independent Medical Examination on Hart

On January 16, 2012, Unum requested that Dr. Rita Bermudez, M.D., a Physical Medicine & Rehabilitation doctor, perform an IME on Hart. AR 1830, 4287. Dr. Bermudez was a graduate from the University of California, Davis School of Medicine, and a full-time practicing physician with a medical license in good standing. AR 1565. Dr. Bermudez conducted an IME of Hart on February 29, 2012. AR 1878. The in-person examination portion of Dr. Bermudez's IME took a total of one hour and twenty-five minutes: an hour for interviewing and twenty-five minutes to physically examine Hart. AR 1878. Thereafter, Dr. Bermudez called Hart the following day to clarify several issues; this call took approximately twenty minutes. AR 3979. Dr. Bermudez spent a total of 8.3 hours on reviewing Hart's records, examining Hart, and writing the twenty-nine page report. AR 3979. After summarizing Hart's history, physical examination, and medical records, Dr. Bermudez provided the following diagnostic impressions: (1) Chronic low back pain with annular tears; (2) Mild degenerative disc disease at L5-S1; and (3) Right plantar arch nodule-fibromatosis. AR 1901.

In her Discussion/Summary section, Dr. Bermudez made several findings. First, in addressing what specific physical examination abnormalities Hart had, Dr. Bermudez

listed several: (1) mild limitation in left rotation of her neck; (2) inconsistent grip strengths that were below normal for her age; (3) restriction in flexion of the lumbar spine at 60 degrees compared to a normal of 90 degrees; (4) extension of spine mildly restricted at 20 degrees compared to a normal of 25 degrees; (5) left side bending mildly restricted at 20 degrees as compared to the right at 25 degrees; (6) tenderness reported to palpitation over the mid thoracic spine and lower lumbar spine; (7) left iliac crest discomfort with left hip external rotation; (8) pulling in the back with sitting [straight leg raise ("SLR")] bilaterally and pain along the left iliac crest with left supine SLR at 80 degrees; and lastly (9) discomfort along the right plantar arch with heel walking. AR 1902–03. Second, Dr. Bermudez found no evidence of medication side effects, cognitive difficulty, sedation, emotional, or pain-related distress. AR 1904. Third, Dr. Bermudez found Hart's movements were "fluid and she did not demonstrate any hesitation, guarding, or obvious impairment in voluntary effort with the exception that her grip strength measurements were inconsistent." AR 1904. Fourth, Dr. Bermudez opined that a review of Hart's medical records did "not support the severity of the restrictions placed by Dr. Nishio." AR 1904. In support of this conclusion, Dr. Bermudez cited the alleged phone call between Dr. Nishio and Dr. Lyon and eight notes by Dr. Nishio from April 2004 through July 2011 with reported normal findings and a lack of sensory or motor deficits. AR 1904.

Dr. Bermudez also found a potential for improvement of Hart's condition. This was based on Hart's past "dramatic improvement" with ESIs. When Hart was asked why she had not pursued further ESIs, Hart explained that she had had a bad experience with an ESI in August 2002 where the needle was placed in the wrong place. AR 4002–03. However, Dr. Bermudez noted there was no record of this incident in Hart's medical records. AR 4003.

In regard to Hart's reported disability in her hands, Dr. Bermudez stated "[c]ertainly, there is documentation of abnormalities or symptoms in the hands. AR 4006. For example, Dr. Bermudez noted a record from Dr. Nishio diagnosing Hart with

16

Dequervain's on November 1, 2008.[14]  AR 4006, 4313.  However, at the same time, Dr. Bermudez found no actual diagnosis of arthritis or any objective evidence of significant arthritis in Hart's hands based on her medical record. AR 4006–07.  Dr. Bermudez recommended "additional work up" in order to identify Hart's options for optimal treatment, and specifically suggested exploring formal physical therapy, epidural injections, and a new spinal MRI for surgical evaluation.  AR 1905.

Finally, Dr. Bermudez opined that based on her IME, Hart had the following restrictions: (1) bending is limited to occasional; (2) standing and walking should be limited to three hours intermittently in an eight-hour day; (3) sitting is limited to five hours intermittently in an eight-hour day; lifting is limited to up to fifteen pounds occasionally and up to ten pounds frequently; (4) climbing of stairs is limited to occasional; and (5) pushing and pulling is limited to occasional and less than twenty pounds.  AR 1906.  Dr. Bermudez concluded her report stating the objective findings of her examination "would not preclude [Hart] from performing within the above stated limitations over an 8-hour workday. AR 1906.

### l.  Dr. Nishio's Post-IME Examination of Hart

On January 18, 2012, Hart visited Dr. Nishio reporting that Hart "flared" her hands going through her records, and that Hart was feeling burning and cramping in her hands. AR 4117.  Hart told Dr. Nishio that Dr. Lokna confirmed she had arthritis in her hands. Upon examination of Hart's hands, Dr. Nishio reported the following: "no swelling.  Some tenderness dorsal wrist.  Negative Tinel's and negative Finkelstein.  Strength is normal. Sensation is intact." AR 4117.

### m. Unum's Labor Market Survey

On April 3, 2012, Unum contracted Genex, an outside company, to perform an independent Labor Market Survey ("LMS") to address local labor market conditions and to obtain additional information as to whether the occupation of Manager of Medical Services

---

[14] Other than Dr. Bermudez's reference to this visit between Hart and Dr. Nishio, the administrative record is devoid of any further details.

United States District Court
Northern District of California

would be suitable for Hart. AR 1933–35. Genex performed the LMS by seeking the same or similar occupational positions within a fifty-mile radius of the Sacramento and Grass Valley in California. AR 1950. Genex attempted to contact fifteen employers; none provided verbal information, none were available for discussion, and none returned Genex's calls or email requests. AR 1950. Nevertheless, Genex identified approximately fourteen positions that "appear[ed] to be within Ms. Hart's restrictions as well as education/experience." AR 1951–58. While Genex only obtained a starting wage of $37.75 for one of these positions, the LMS reported that according to the Bureau of Labor Statistics, the median annual wage of medical and health services managers was $84,270 in May 2010. AR 1958.

On May 31, 2012, Darrington Crane, a Senior Vocational Rehabilitation Consultant with Unum, conducted a vocational review and concluded that considering Hart's age, prior work history, skills, education/training, experience, station in life, and physical and mental capacity, Hart could earn a gainful wage within twelve months of working as a Manager of Medical Services. AR 1986, 1991. Crane specifically recognized that Hart had been out of the workforce for over five years, but also recognized that Hart had five years of experience in this same occupation, that Hart had a Master's degree, and that Hart had a clinical background. AR 1991.

### n. Unum's Termination of Hart's Benefits

Finally on June 7, 2012, Unum terminated Hart's benefits, finding she was no longer disabled. Hart's denial letter explained that in light of Dr. Bermudez's IME and Unum's vocational review of Hart, Hart no longer met her policy's definition of being disabled:

> Based on the Independent Medical Examination that was conducted on February 29, 2012, your medically support [sic] restrictions and limitations do not preclude you from performing any occupation which would be considered gainful. Your medically supported restrictions and limitations no longer meet the policy's definition of disability and benefits are no longer payable.

AR 1998–99. In support of its decision, Unum pointed to the alleged conversation

between Dr. Nishio and Dr. Lyon, the results of Dr. Bermudez's IME, and Unum's vocation review determining that gainful employment existed for Hart.  AR 1998–99.

### o.   Hart's Appeal and Final Denial

On December 4, 2012, Hart appealed the denial of her LTD benefits through her attorney.  AR 4023.  In support of the appeal, Hart submitted a letter from Dr. Nishio dated December 4, 2012.  AR 4392.  The letter explained that Dr. Nishio was treating Hart for "severe chronic lower back pain, lumbar spine degenerative disc disease, plantar fascia fibromatosis and pain her hand and wrists."  AR 4392.  Dr. Nishio also stated that during the course of treatment, she "noted the intensity and duration of her pain symptoms were reasonably consistent with her work.  [Hart] reported more intense pain during those times when her work was stressful, or she worked longer hours."  AR 4392.  Also, Dr. Nishio opined that Hart is "completely and totally disabled by degenerative disc disease, a progressive condition that affect [sic] her lumbar vertebra resulting in sever [sic] chronic pain, restricted range of motion, and nervous system impairment that causes Ms. Hart's muscle weakness and triggers her spasms;" consequently, Hart "cannot perform any activity the [sic] involves periods of sitting, standing or walking, even for relatively brief periods of time."  AR 4392–93.  Finally, Dr. Nishio stated that since her last visit with Hart on September 26, 2012, Hart's medical conditions had not significantly improved and that Dr. Nishio believed Hart was "still disabled and will be unable to perform any occupation that requires continuous periods of intermittent sitting, standing, walking, climbing stairs or keyboarding."  AR 4393.

On January 15, 2013, Dr. William Sniger, M.D., a Physical Medicine and Rehabilitation doctor with Unum, performed a review of Hart's entire file.  AR 4435.  He was tasked with reviewing her medical record to determine Hart's functional capability and any necessary restrictions and limitations.  AR 4435.  After reviewing Hart's file, Dr. Sniger concluded:

> The level, intensity, frequency of treatment, diagnostic information and ADL information do not support the asserted severity of symptoms and functional loss as of 6/7/2012.  MRI

19

studies in 2001 & 2004 showed an annular tear in L4-5, but without canal or foraminal stenosis or herniation. No subsequent imaging studies have been performed and no EMG/NCS has been performed to provide electrodiagnostic evidence of radiculopathy, neuropathy or other pathology.

. . .

The severity of conditions, symptoms and functional limitations as described by the insured are out of proportion to the tests, procedures and clinical examinations. Neurological exams have been nonfocal and gait was nonantalgic and [range of motion] was WFL. . . . Onset date that the degree and/or severity of conditions, symptoms, and functional limitations as described by the insured were not verifiable cannot be determined with certainty as it is impossible to prove a negative [sic]. However, available records do not support any impairment that would preclude FT work as of [the date of disability] on 12/27/06.

AR 4441–42. In sum, Dr. Sniger concluded that Hart was capable of sedentary work within her reasonable restrictions and limitations. AR 4442.

On January 17, 2013, Richard Byard, a Vocational Rehabilitation Consultant with Unum, also reviewed Hart's file. AR 4444–46. Mr. Byard concluded Hart's prior work fell properly within the occupation of a Case Management Manager – a sedentary occupation – and that Hart could perform her prior occupation within her restrictions and limitations. AR 4445. Consequently, Mr. Byard opined "this occupation would remain as a suitable and gainful alternative occupation for this insured." AR 4446.

On January 18, 2013, Unum upheld its earlier decision finding Hart was no longer disabled, and therefore no longer eligible to receive benefits under the terms of her LTD policy. AR 4449–61. Again, Unum cited the alleged call between Dr. Nishio and Dr. Lyons, the results of Dr. Bermudez's IME, and Unum's vocational review.[15] As a result of Unum's final ruling, Hart filed this suit on November 24, 2015. *See* Compl.

## II.  **LEGAL STANDARDS**

Under the Employee Retirement Income Security Act, ("ERISA"), a beneficiary may sue "to recover benefits due to him under the terms of his plan . . . ." 29 U.S.C. §

---

[15] In addition, Unum also included a provision in Hart's claim related to self-reported symptoms. *See* AR 4454. The Parties dispute whether Unum's reliance on the provision was proper. Hart's Mot. at 5:17; Unum's Opp'n at 15:1–13. However, because Unum does not rely on this provision in support of its termination, the Court need not resolve the matter.

1132(a)(1)(B). Federal Rule of Civil Procedure 52(a)(1) provides that "[i]n an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately." In a Rule 52 motion, as opposed to a Rule 56 motion for summary judgment, the Court does not determine whether there is an issue of material fact, but actually decides whether the plaintiff is disabled under the policy. *Oster v. Standard Ins. Co.*, 759 F. Supp. 2d 1172, 1185 (N.D. Cal. 2011) (citing *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999)). Thus, the Court must conduct "a bench trial on the record" through which it evaluates the persuasiveness of conflicting testimony and makes findings of fact based on a rereading of the material in the administrative record. *Kearney*, 175 F.3d at 1095.

A denial of benefits challenged under ERISA "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Here, the parties agree the Court should apply a de novo standard of review to Hart's claims. Mot. at 15:21–23; Unum Mot. at 20:20–21:2. Under this standard of review, "the court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan." *Muniz v. Amec Constr. Mgmt, Inc.*, 623 F.3d 1290 (9th Cir. 2010). In an ERISA action, the plaintiff carries the burden of showing, by a preponderance of the evidence, that he or she was disabled under the terms of the Plan during the claim period. *Oster*, 759 F. Supp. 2d at 1185. Generally, the Court's review is limited to the evidence contained in the administrative record; however, the Court may consider extrinsic evidence "*only* when circumstances *clearly establish* that additional evidence is *necessary* to conduct an adequate de novo review of the benefit decision." *Opeta v. Nw. Airlines Pension Plan for Contract Emps.*, 484 F.3d 1211, 1217 (9th Cir. 2007) (emphasis in original).

## III.    CONCLUSIONS OF LAW[16]

Based upon an exhaustive review of the administrative record here, the Court finds Hart has established she was disabled under the Plan's definition of disability at the time her benefits were discontinued

### a.  Hart's Exhibits Regarding Unum's Past History and Unum's Settlement with the State of California

At the outset, the Court addresses Hart's inclusion of the Public Report of the Market Conduct Examination of the Claims Practices of Unum, ECF No. 57-1 at 110, and the California Settlement Agreement ("CSA") regarding Unum, ECF No. 57-1 at 133, in her motion. As Unum correctly noted, these documents are outside of the administrative record. Unum Mot. at 12:23–25. And, as noted above, the Court may consider evidence outside of the administrative record "*only* when circumstances *clearly establish* that additional evidence is *necessary* to conduct an adequate de novo review of the benefit decision." *Opeta,* 484 F.3d at 1217 (emphasis in original).

Here, it appears that Hart submitted the two exhibits for three purposes. First, to illustrate Unum's "long history of illegal and unethical claims handling practices and the settlement the company entered with the State of California to remedy these misdeeds." Hart Mot. at 4:15–19. Second, Hart cites to the CSA to show how the definition of the "any occupation" provision of disability had changed in Hart's policy. Hart Mot. at 5:9–16. *See* AR 2000, 4458. Lastly, Hart uses the CSA to argue that Unum violated the CSA by invoking the policy's self-reported condition limitation when denying Hart's appeal. Hart Mot. at 5:17–21.

Unum argues this evidence should be stricken as it is outside the administrative record and is not needed for the Court to make its determination. Unum Opp'n at 12–15. Should the Court accept Hart's external evidence, Unum requests that the Court take judicial notice of rebuttal evidence attesting to Unum's upright claim handling. ECF No.

---

[16] To the extent that any of the foregoing findings of fact are deemed to be conclusions of law, they are incorporated herein.

58-1.  On the other hand, Hart contended during oral arguments that *Opeta* is not the appropriate standard to apply to this evidence because the documents are public records and may therefore be properly introduced through judicial notice.

The Court finds Hart's external evidence is improper and unnecessary.  First, a review of Unum's past claims history is not necessary for the Court to conduct an adequate de novo review of Hart's benefit decision.[17]  The definition of the "any occupation" disability definition that is stated in the CSA is already contained in the administrative record and Unum is not relying on the policy's self-reported condition limitation to uphold its decision to terminate Hart's benefits.   Therefore, it is not allowed under *Opeta*. Second, while some courts have taken judicial notice of public records and the reports of administrative bodies in ERISA cases, *see, e.g., Wible v. Aetna Life Ins. Co.*, 375 F. Supp. 2d 956, 965–66 (C.D. Cal. 2005), the Court has discretion in deciding whether to take judicial notice.  *Kassab v. Gore*, 656 F. App'x 868, 869 (9th Cir. 2016).  Here, the Court finds Hart's outside evidence is improper as it adds nothing of material value to the record. *See Shaw v. Life Ins. Co. of North Am.*, 144 F. Supp. 3d 1114, 1125 (C.D. Cal. 2015) (refusing to take judicial notice of evidence outside the administrative record, including a public record, in an ERISA case).  Accordingly, the Court STRIKES Hart's Public Report of the Market Conduct Examination of the Claims Practices of Unum, ECF No. 57-1 at 110, and the California Settlement Agreement ("CSA") from the record.

### b.  Definition of Disability

Under Hart's policy, at the time her LTD benefits were terminated, she was considered "disabled" if she was unable to "engage with reasonable continuity in another occupation in which she could reasonably be expected to perform satisfactorily in light of her age, education, training, experience, station in life, physical and mental capacity."  AR 2000.[18]  The Court turns to address whether Hart was disabled at the time her benefits were

---

[17] Hart conceded this point during oral argument.
[18] During oral arguments the Parties agreed this was the proper definition of disability which applied when Hart's benefits were terminated.

terminated.

### c. Hart's Prior Finding of Disability is Significant

Several courts consider a past finding of disability or past payments of benefit payments to weigh against an insurer unless the insurer can show significant changed circumstances that justify the change. *See McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002) ("We are not suggesting that paying benefits operates forever as an estoppel so that an insurer can never change its mind; but unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments"); *Bledsoe v. Metropolitan Life Ins.*, 90 F. Supp. 3d 901, 910–11 (C.D. Cal. 2015) (finding that because an insurer had found the plaintiff was disabled for the prior three years, the Court would expect the insurer to provide a "significant change in the circumstances of Plaintiff's condition" to support its decision to stop paying benefits).

On this issue, the Ninth Circuit's decision in *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863 (9th Cir. 2008) is instructive to the Court's analysis. In that case, the plaintiff was suffering from a degeneration of her cervical spine, which was confirmed by MRI scans and x-rays. *Id.* at 866. After a car crash aggravated her condition, Saffon quit her job and applied for LTD disability benefits, which Metropolitan Life Insurance Company ("MetLife") approved. *Id.* After paying LTD benefits for a year, MetLife informed the plaintiff that she no longer met the definition of disability and terminated her LTD benefits. *Id.* at 869. This finding was based on a review of plaintiff's medical records: a doctor commissioned by MetLife found plaintiff's records lacked detailed, objective, functional findings or testing which would completely preclude an effort by the plaintiff to return to work. *Id.* at 869. The plaintiff filed an appeal and provided her most recent MRIs and a letter from her treating neurologist who confirmed the plaintiff was unable to tolerate sustained sitting, but MetLife denied her appeal. *Id.* The district court reviewed the plaintiffs claim and found MetLife had not abused its discretion in terminating the plaintiff's benefits. On appeal, the court stated: "Metlife had

24

been paying long-term disability benefits for a year, which suggests that she was already disabled . . . [i]n order to find her no longer disabled, one would expect the MRIs to show an *improvement*, not a lack of degeneration." *Id.* at 871 (emphases in original).

The same reasoning applies here with greater force. Here, like the plaintiff in *Saffon,* there are objective MRI images confirming Hart's back problems. These MRIs show disc bulges and annular tears in Hart's back and, while they may not be recent, they confirm she has degenerative disc disease – a fact Unum does not dispute. Similarly, Unum has been paying Hart LTD benefits for almost *eight* years. Furthermore, throughout this period, Unum has repeatedly sought continuing proof of disability, including a field visit. Each time, Unum approved Hart's benefits. Therefore, for Unum to now claim Hart was not disabled at the time her benefits were terminated in June 2012, one would expect Unum to provide some evidence of Plaintiff's medical progression at the time her benefits were terminated.

### d. Dr. Nishio is Credible

At issue between the parties is whether Dr. Nishio and her findings are credible. "The credibility of physicians' opinions turns not only on whether they report subjective complaints or objective medical evidence of disability, but on (1) the extent of the patient's treatment history, (2) the doctor's specialization or lack thereof, and (3) how much detail the doctor provides supporting his or her conclusions." *Shaw*, 144 F. Supp. 3d at 1129. While Unum need not "accord special weight to the opinions of a claimant's physician," it cannot "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord*, 528 U.S. 822, 834 (2003). At the same time, "[c]ourts have typically afforded greater weight to the opinions of physicians who have treated the claimant for an allegedly disabling condition for a long period of time," and to "doctors whose specialty relates to the alleged disability." *Shaw*, 144 F. Supp. 3d at 1129–30 (collecting cases).

The Court finds Dr. Nishio to be credible. First, while Dr. Nishio is not an orthopedist or a specialist in pain management or back injuries, the record reflects that Dr.

25

1  Nishio has treated Hart's back injury since September 2001. In other words, prior to

2  Unum's termination of Hart's benefits, Dr. Nishio had treated Hart's back injury for

3  almost eleven years. And during this period, Dr. Nishio examined Hart at least once every

4  year, with the exception of 2003. Moreover, Dr. Nishio's documentation of Hart's

5  condition provides extensive detail supporting her conclusions. For example, in her IME

6  report, Dr. Bermudez provided the following *summary* of Dr. Nishio's April 26, 2005

7  examination notes:

> Disc back pain. Now on medical separation and pursing perm[anent] disability. Cont[inues] to see physiatrist who prescribers her MS Contin. Uses occ[asional] Vicodin for break through pain. Pain is better managed now that she is not at work. Dr. Zuckerman recommended a discogram before artif[icial] disc replacement. She is able to take lot[s] of breaks, which keep pain down during the day. No longer need the back brace. Several stressors. Her dad died. Neuro negative. MS per HPI. Appearance, healthy, pleasant effect. NO apparent distress. Back symmetric, no curvature. [Range of motion] normal. No CVA tenderness. Chronic LBP. Anxiety continues med[ications]. Her pain is much more manageable on her current program.

15  AR 3993. Certainly, Dr. Nishio's examination notes provide more than mere cursory,

16  conclusory diagnoses. Her notes reflect careful, thorough medical exams of Hart. And

17  again, as mentioned above, Hart's back problems and Dr. Nishio's notes are corroborated

18  by evidence in the record, including Hart's MRI, other doctor reports, and Hart's own

19  statements.

20  Unum attempts to rebut Dr. Nishio's conclusions with its own evidence. The Court

21  considers each in turn.[19]

22  ///

23  ///

24

25  [19] The Court shall not consider the Social Security Administration's decision to deny Hart's application simply because Unum did not rely on this in denying Hart's benefits and

26  "[a] plan administrator may not fail to give a reason for a benefits denial during the administrative process and then raise that reason for the first time when the denial is

27  challenged in federal court . . . ." *Harlick v. Blue Shield of Cal.*, 686 F.3d 699, 719 (9th Cir. 2012). Moreover, because this happened in December 2006 – approximately 5.5 years

28  before Hart's benefits were terminated – it is hardly relevant in determining whether Hart was truly disabled in June 2012.

### e. **The Alleged Phone Call Between Dr. Lyon and Dr. Nishio is Not Credible**

In terminating Hart's benefits, Unum relies on the alleged call between Dr. Lyon and Dr. Nishio on December 19, 2011. AR 1998. According to Dr. Lyon, he called Dr. Nishio to discuss Ms. Hart's medical history, and when he asked Dr. Nishio if she "felt Ms. Hart was medically precluded from engaging in full time primarily seated work activities," Dr. Nishio replied "she did not know and had no opinion." Moreover, Dr. Lyon alleges that Dr. Nishio recommended a PMR IME should be done and that "without this, [she] had no opinion on Ms. Hart's functional capacity." AR 1525–26.

The Court finds this evidence lacks credibility. First, although Dr. Nishio never replied to Dr. Lyons letter, there is no evidence showing Dr. Nishio ever received the letter. Indeed, Unum never confirmed that Dr. Nishio received the letter via fax, and rather than mailing the letter to Dr. Nishio's office, Unum sent it to a separate facility. AR 1525, 1528. Thus, under these circumstances, Dr. Nishio's failure to rebut Dr. Lyon's account is not conclusive, or even persuasive, evidence that she agreed with his summary. In addition, Dr. Nishio's alleged statements are completely at odds with years' worth of her treatment notes, and with notes from her most recent exam of Hart. Only five months earlier, Dr. Nishio had examined Hart and noted that Hart "still ha[d] all the limitations of the [Degenerative Disc Disease]," and "[s]till [had] lower back tenderness especially late in the afternoon." AR 1460. Admittedly, Dr. Nishio also noted some minor signs of improvement such as Hart trying to wean off her meds, Hart not wearing her back corset, and Hart being able to do "well in a controlled environment." But these improvements are not in tension with Hart's continuing limitations as Dr. Nishio stated that Hart was "overall doing somewhat better *off work* and on current meds." *Id.* (emphasis added). In addition, that same day, Dr. Nishio submitted an APS to Unum in which she noted that Hart had been experiencing persistent pain, spasms, overall fatigue, and limited range of motion in Hart's back, and also opined that Hart would "never" be able to return to work. AR 3534–35. In light of this examination and Dr. Nishio's corresponding notes, the Court finds it

unlikely that Dr. Nishio would suddenly have no opinion on Hart's condition.

### f.  Ms. Bermudez's Independent Medical Examination

In terminating Hart's benefits, Unum also heavily relied on Dr. Bermudez's IME. AR 1998.  Notably, Dr. Bermudez found Hart suffered from nine physical examination abnormalities and from several physical limitations. AR 1903–06.  Again, according to Dr. Bermudez, Hart's "[s]tanding and walking should be limited to 3 hours intermittently in an 8-hour day" and Hart's sitting should be "limited to 5 hours intermittently in an 8-hour day."  AR 1906.  Although these conclusions do not fall below the four-hour sitting threshold set by the Ninth Circuit for sedentary work, *see Armani v. Northwestern Mut. Life Ins. Co.*, 840 F.3d 1159, 1163 (9th Cir. 2016), they illustrate that even by the IME's conclusions Hart was significantly impaired and nearly precluded from sedentary work as a matter of law.

Perhaps more importantly, a thorough review of Dr. Bermudez's report illustrates she gave insufficient weight to Hart's prior MRIs.  For example, Dr. Bermudez found Hart suffered from mild degenerative disc disease, yet, in the Discussion/Summary section of her IME report, she found "the medical records and the examinations are insufficient to confirm the ongoing severe restrictions as described by Dr. Nishio."  AR 4005.  In support of this conclusion, Dr. Bermudez relied on several of Dr. Nishio's examinations with "normal" findings, and her own physical examination in which she determined Hart's movements were "fluid" without any evidence of "pain related distress." AR 4005.  But other than briefly mentioning Hart's MRIs in the sections introduction, Dr. Bermudez never attempts to refute the validity of the MRIs or to explain why they no longer supported Hart's alleged disability.  Rather, Dr. Bermudez simply noted there was "no recent MRI scan" and recommended Hart undergo a "new MRI scan to determine the status of her lumbar spine with regard to the discs and, depending on the results, possibly a surgical evaluation."  AR 4006.  But a new MSI study was never conducted before terminating Hart's benefits.  Thus, this case appears somewhat more egregious than *Saffon*. There, the defendant relied on the plaintiff's most recent MRIs to show the plaintiffs

condition had not significantly changed and to deny benefits. *Saffon*, 522 F.3d at 869. Here, in contrast, Unum is relying on a report that mostly ignored Hart's MRIs altogether to deny Hart's benefits.

The record also reflects Unum did not grant sufficient weight to Hart's history of pain. The Ninth Circuit has held that subjective evidence of pain must be properly weighed and cannot be ignored. *See Schramm v. CNA Fin. Corp. Insured Grp. Benefit Program*, 718 F.2d 1151, 1163 (N.D. Cal. 2010) (a "Defendant's attempt to discount Plaintiff's subjective reports of pain is not supported by Ninth Circuit precedent."); *Saffon*, 522 F.3d at 872 ("individual reactions to pain are subjective and not easily determined by reference to objective measurements." ); *Fair v. Bowen*, 885 F.2d 597 (9th Cir. 1989) ("[D]espite our inability to measure and describe it, pain can have real and severe debilitating effects; it is, without a doubt, capable of entirely precluding a claimant from working. Because pain is a subjective phenomenon, moreover, it is possible to suffer disabling pain even where the degree of pain, as opposed to the mere existence of pain, is unsupported by objective medical findings."). While Unum has placed particular emphasis on the fact that the MRI findings were "small" and "mild," AR 3990, 4002, this characterization fails to take into account Hart's long history subjective pain or to explain why the MRIs were initially acceptable to Unum as objective proof of her disability. Here, where there are objective MRIs confirming Hart's back problems and where there are several years' worth of records documenting Hart's pain and her regular use of pain medications, there is "substantial objective and reliable medical evidence in the record to support the severity of plaintiff's disabling pain allegations." *Jahn-Derian v. Metropolitan Life Ins. Co.*, 2016 WL 1355625, at *8 (C.D. Cal. Mar. 31, 2016) (finding objective evidence of pain where a plaintiff diagnosed with degenerative disc disease provided several documented instances of pain). Also, like the plaintiff in *Schramm,* here, Hart consistently reported that she experienced pain and "[a]lthough she reported some improvement in her level of pain . . . she never stated that she was free of it." *Schramm*, 718 F. Supp. 2d at 1163. Additionally, because Hart was diagnosed with a degenerative

1    spinal disease, "it is reasonable to infer that, over time, Plaintiff's pain would increase."

2    *Id.* Despite this long history of pain, Dr. Bermudez relied on her sole physical assessment

3    in determining Hart's "movements were fluid" and that "[t]here was no evidence of . . .

4    pain related distress." Clearly, it is puzzling how a single twenty-five minute physical

5    examination can so easily displace years of documented pain without further explanation,

6    testing, or evidence.

7         Unum also contends that Hart is not disabled because her pain is adequately

8    controlled. In support of this argument, Unum highlights several of Dr. Nishio's notes

9    which noted Hart's pain was well-managed and that Hart was not wearing her back brace.

10   Unum also argues that "[i]f Plaintiff was truly in the pain such that her activities were as

11   limited [as] she claimed, then surely she would pursue additional treatment." Unum Mot.

12   at 24:16–17. However, again, Hart never stated she was free of her pain. ." *Schramm*,

13   718 F. Supp. 2d at 1163. Also, "several courts . . . have recognized that disability

14   claimants should not be penalized for attempting to lead normal lives in the face of their

15   limitations." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). Additionally, the fact

16   that Hart advised her doctors when she was feeling better "is unlikely behavior for a

17   person intent on overstating the severity of her ailments." *Reddick*, 157 F.3d at 724**.**

18        **g. Dr. Lyon's and Dr. Sniger's Paper Reviews of Hart's Medical Records**

19        With regard to Dr. Lyon's and Dr. Sniger's review of Hart's medical records

20   "courts generally give greater weight to doctors who have actually examined the claimant

21   versus those who only review the file, especially when they are employed by the insurer."

22   *Backman v. Unum Life Ins. Co. of Am.*, 191 F. Supp. 3d 1053, 1066 (N.D. Cal. 2016).

23   Consequently, the Court gives lesser weight to these opinions. Although these doctors

24   reviewed Hart's medical records, they did not examine her in person, which would be

25   particularly important here given the fact that the Parties dispute is over Hart's physical

26   capabilities.

27        **h. Plaintiff Cannot Work in a Gainful Occupation**

28        Accepting Dr. Nishio's conclusions as true, the Court accepts Dr. Nishio's

conclusion that Hart is "unable to perform any occupation that requires continuous periods of intermittent sitting, standing, walking, climbing stairs or keyboarding." *Id.* Therefore, the Court concludes Hart could not find "gainful occupation" in light of her age, education, training, experience, station in life, physical and mental capacity.

## IV. CONCLUSION

For the reasons stated above, the Court is persuaded that Hart, more likely than not was disabled under the Policy's terms at the time her benefits were terminated on June 7, 2012. Hart presents sufficient evidence of her disability, and Unum does not persuade the Court that Hart or her treating physician's statements are not credible. Accordingly, the Court GRANTS Plaintiff's Motion for Judgment and DENIES Defendant's Motion for Judgment.

The Clerk of the Court shall enter judgment and close the file.

**IT IS SO ORDERED.**

Dated: 5/24/2017

THELTON E. HENDERSON
United States District Judge